UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                    **DECISION AND ORDER**

SCOTT J. BARNES,                      Case No. 23-MR-00551

　　　　　　　　Defendant.

---

## I.　　INTRODUCTION

Defendant Scott J. Barnes (hereinafter "Defendant") has been charged by way of a criminal complaint with violating 18 U.S.C. § 922(g)(1) by unlawfully possessing a firearm as a convicted felon.　(*United States v. Barnes*, Case 1:23-mj-00166-HKS, Dkt. 1 (W.D.N.Y. Dec. 7, 2023) (hereinafter "Case No. 23-mj-166")).[1]　Upon his arrest on December 7, 2023, Defendant appeared before United States Magistrate Judge H. Kenneth Schroeder, Jr., and the government moved for detention.　(*Id*. at 12/7/2023 Minute Entry).

A detention hearing was held before Magistrate Judge Schroeder on December 12, 2023, at which time the government's request for detention was denied and Defendant was ordered released subject to conditions, including electronic monitoring at the discretion of

---

[1]　　The maximum statutory penalty if convicted of this crime is 15 years in prison.　18 U.S.C. § 924(a)(8).　The government has estimated that the Sentencing Guidelines would recommend an approximate three-year prison sentence.

the United States Probation Office ("USPO") and requiring that Defendant reside at a verifiable address. (*Id*. at 12/12/2023 Minute Entry; Dkt. 5 (Transcript) at 35-39[2])).

The government filed an appeal which was assigned to United States District Judge John L. Sinatra, Jr., who issued a stay of the release order pending further determination by the district court. (Dkt. 1; Dkt. 2). The case was subsequently reassigned to the undersigned (Dkt. 4), and the appeal was heard on December 18, 2023, and continued on December 27, 2023, at which time the Court reserved decision (Dkt. 6; Dkt. 8). After carefully considering the record and the factors as set forth at 18 U.S.C. § 3142(g), the Court hereby revokes the release order and orders Defendant detained pending trial, based on its findings that there are no conditions of release that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community.

## II.    <u>BACKGROUND</u>

The background of the government's investigation and the relationship with a number of other cases is set forth in the Decision and Order issued on today's date in the case of *United States v. Ermin*, Case No. 1:23-mr-00552-EAW, Dkt. 10 (W.D.N.Y. Jan. 3, 2024) (hereinafter "Case No. 23-mr-552"), which is incorporated herein by reference and will not be repeated. Instead, this Decision and Order focuses on additional details specifically relevant to Defendant's custody status.[3]

---

[2]    When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

[3]    In connection with this matter, the Court has considered the almost 7 hours of argument before the undersigned on December 18 and 27, 2023, the numerous exhibits

On December 7, 2023, a search warrant was executed at the Outlaws Motorcycle Club ("Outlaws MC") Clubhouse located on Northumberland Avenue in Buffalo, New York. Defendant was the only person at the Clubhouse at the time law enforcement arrived. Defendant was residing at the Clubhouse and had been for a period of time. Defendant's counsel proffered that Defendant had been residing at the Clubhouse because he underwent two back surgeries in 2023—most recently on November 14, 2023[4]—and this caused him not to be able to work. According to Defendant's counsel, Defendant was injured during Bike Week held in Daytona, Florida, in March 2023, necessitating the aforementioned two back surgeries.

---

offered by the government, the transcript of the detention hearing held before Magistrate Judge Schroeder on December 12, 2023, the information set forth in the Pretrial Services Report prepared by the USPO, and the criminal complaint filed against Defendant in Case No. 23-mj-166. It should be noted that at the same time the Court was hearing the government's appeal concerning the release order pertaining to Defendant, it also heard the government's appeals from release orders pertaining to John Thomas Ermin a/k/a Tommy O ("Ermin") in Case No. 23-mr-552 and Michael Roncone (*see United States v. Roncone*, Case No. 1:23-mr-00566-EAW, Dkt. 1 (W.D.N.Y. Dec. 19, 2023)). Some of the information proffered during those latter two cases overlapped with the information pertaining to Defendant, and in fact, during the proceedings on December 27, 2023, with the consent of defense counsel, the arguments concerning Defendant were heard at the same time as those pertaining to Ermin. The Court previously denied the government's appeal pertaining to Roncone and ordered him released subject to conditions. (*See United States v. Roncone*, Case No. 1:23-mj-00168-HKS, Dkt. 9; Dkt. 10; Dkt. 11 (W.D.N.Y. Dec. 21, 2023)).

[4]    According to a letter from an orthopaedic spine surgeon offered by Defendant, he underwent "major revision spine surgery" on November 14, 2023. The letter indicates that Defendant will require "pain medication and activity modification for at least 3 months, through February 14, 2024." The letter also indicates that Defendant will need to "sleep on a firm and supportive mattress/surface" and that he would "benefit from physical therapy for gait training 2-3 times per week for the next 6 weeks."

Recovered from the living area where Defendant was residing was a loaded Glock semi-automatic pistol, and the government reports that the firearm was stolen. The Glock was in plain view on an end table next to a couch in the living area. Defendant is a convicted felon, having been convicted on October 20, 1991, in a General Court Martial of wrongful possession, distribution, and use of LSD, for which he was sentenced to four years confinement.

While being detained by law enforcement outside the Clubhouse during execution of the search warrant, Defendant was asked whether there were any weapons in the Clubhouse and he responded that he had no weapons "on him" and then he further offered when asked the same question again, "not that I know of." However, Defendant indicated that his cell phone was inside the Clubhouse and he described the location, which was in close proximity to the Glock (approximately five feet away).

The items seized from the Clubhouse, including Nazi symbolism, references to violence against so-called "snitches" as well as women, and various types of weapons, are described in further detail in the *Ermin* Decision and Order. Also recovered during execution of the search warrant was a letter to Defendant from Jack Rosga a/k/a Milwaukee Jack ("Rosga"),[5] dated September 14, 2023. The letter is addressed to "Big Scott 1%er" and is signed by "Milwaukee Jack 1%er BBT." The letter references two recent letters received by Rosga from Defendant, and also references Ermin as "Tommy O 1%er."

---

[5]    The government has proffered that Rosga is the former national president of the Outlaws MC who is currently in prison.

Another letter addressed to Defendant and recovered from the Clubhouse is dated "Nov. 8th Wed"[6] and written on stationery containing various racist and nazi symbolism. Among other things, that letter makes reference to Defendant being a "BBT."

The government proffered that Defendant is believed by law enforcement to be a member of national leadership of the Outlaws MC—specifically, the National Enforcer who reports to the National President (who is Ermin according to the government). He is a member of the Baseball Bat Team, or "BBT," which the government proffers signifies an individual hand-selected within the organization who is known to be willing and ready to undertake acts of violence on behalf of the club to protect the interests of the club.

After his arrest, Defendant was interviewed by the USPO and a Pretrial Services Report ("Bail Report") was prepared recommending that Defendant be released subject to conditions. The Bail Report identifies Defendant as 55 years old with no identified family connections.[7] Defendant's Bail Report also reflects mental health diagnoses and prior substance abuse issues. However, Defendant represented he has been sober since January 1, 2021.

According to the Bail Report, Defendant stated he relocated to Western New York three years ago, but based on both the government's proffer and defense counsel's

---

[6]    November 8, 2023, fell on a Wednesday. Thus, it appears that the date of the letter is November 8, 2023.

[7]    According to the Bail Report, Defendant's parents are deceased and he has no contact with any of his siblings. Although he has two children from a prior marriage, Defendant declined to disclose their names—but stated he maintains a positive relationship with them. USPO was unable to verify this information.

statements, it appears that the relocation actually occurred in the latter part of 2021.[8]  The government proffered evidence of Defendant being observed riding his motorcycle on October 8, 2021, in Western New York, and travelling to Pharaoh's Gentlemen's Club ("Pharaoh's").[9]  (*See* Govt. Ex. 12C; Govt. Ex. 12D).  Defendant is pictured wearing a jacket with a reference to "United States" on the back, signifying his national role in the Outlaws MC organization.

Defendant also told USPO that he had been living at the Outlaws MC Clubhouse for the past year and a half, although this is not consistent with the representation that Defendant's move into the Clubhouse was necessitated by financial circumstances due to his back surgeries in 2023.

According to Defendant's counsel, when his client first moved to the area he resided at 19 Grattan Street in Cheektowaga, New York.  As discussed in the *Ermin* Decision and Order, 19 Grattan Street is represented by the government to be the residence of Paul Raslawsky a/k/a PJ Raslawsky, a cook at Pharaoh's, who is also charged by criminal complaint with a violation of 18 U.S.C. § 922(g)(3).  (*See United States v. Raslawsky*, Case No. 1:23-mj-01180-JJM, Dkt. 1 (W.D.N.Y. Nov. 29, 2023)).   A search warrant was executed in March 2021 at 19 Grattan Street, and the paperwork related to that search was found during execution of the search warrant on December 7, 2023, at Ermin's residence.

---

[8]    Defendant's counsel stated at the appearance on December 27, 2023, that his client's best recollection is that he moved to Western New York on September 6, 2021.

[9]    As discussed in the *Ermin* Decision and Order, Pharaoh's is owned by Peter Gerace, and Ermin works there as the General Manager.

In addition to the felony conviction underlying the charged offense, Defendant's prior criminal record includes misdemeanor convictions from September 2018 in Epping, New Hampshire.  The government obtained a copy of the police paperwork pertaining to that incident, along with a video of the events.  The incident apparently arose over individuals wearing clothing reflecting support of the Hell's Angels Motorcycle Club. Defendant and other Outlaws MC members informed the individuals that they were disrespecting their territory, and ultimately Defendant walked outside and without any apparent provocation is observed on the video sucker punching another individual.

The government also showed other video evidence.  One was a video that the government submits represents the attendees at a hastily-convened leadership meeting of the Outlaws MC held for four hours at the Hilton Inn at the Buffalo Airport on February 11, 2023.  Approximately 30 members of the Outlaws MC holding various leadership ranks within the organization were in attendance.  Those in attendance reflected individuals from different parts of the country (as depicted by the geographical location reflected on their jackets or vests).  Defendant attended the meeting, entering the hotel right behind Ermin.

Another video showed by the government reflects an incident at Halligan's Bar in Lockport, New York, occurring on or about November 25, 2022, when approximately 16 members of the Outlaws MC—including Defendant, Keith Elsaesser,[10] Corey Benson (who

---

[10]     Elsaesser was present in the courtroom for the proceeding involving Defendant on December 18, 2023.  Elsaesser owns the home that is proposed for Defendant's release.  In addition, Elsaesser is well known to the Court, as he regularly attended a four-month jury trial that the undersigned handled in 2018, involving the Kingsmen Motorcycle Club. Elsaesser was observed taking copious notes during that trial and, when confronted by the

is holding a cane with what appears to be baseball bat at the end),[11] and Eugene Mike Marcaccio[12]—converge upon the bar as a show of force to confront the cook who worked there and who was displaying KMC colors without authorization in Outlaws MC territory. Defendant is the last Outlaws MC member to enter the bar, and the last one to leave—reflecting according to law enforcement his highest rank among those in attendance and the purpose of the visit.

## II.    <u>LEGAL STANDARD</u>

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal. The procedures and standards for release or detention of a person pending trial are set forth at 18 U.S.C. § 3142. A defendant awaiting trial must be released unless the release will present a risk of flight or danger, or both, and no set of conditions can reasonably protect against those risks. *See United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (explaining that the Bail Reform Act codified "traditional presumption favoring pretrial release for the majority of Federal defendants" (quotation omitted)).

---

FBI, claimed that he was writing for the "Aging Rebel," which the government submits was false.

[11]    Benson was involved in an alleged gang assault in April 2010, as detailed in the *Ermin* Decision and Order.

[12]    In the video, Marcaccio appears to be the individual who sits the cook down and confronts him. Marcaccio appeared in court at the proceedings involving Ermin on December 19, 2023. The government has proffered that Marcaccio is either the new Buffalo chapter president of the Outlaws MC or the new Blue Regional president.

The government bears the burden of proof to establish risk of flight and/or danger, and that no conditions can reasonably protect against those risks. The burden of proof with respect to risk of flight is preponderance of the evidence. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). On the other hand, the government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger. *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *Id.* In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty." *Id.*

Although there is "only a limited group of offenders who should be denied bail pending trial," *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citations and quotations omitted), when there is "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," *Chimurenga*, 760 F.2d at 403 (quotations omitted). While a prior record of violence or dangerous conduct "eases the government's burden of showing dangerousness, it is not essential. The government's burden is only to prove dangerousness by clear and convincing evidence." *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991). Moreover, in assessing a risk of danger, the inquiry is not limited to potential acts of violence. The potential for obstruction of justice or witness tampering may constitute a "threat to the integrity of the trial process, rather than more generally a danger to the community," and be sufficient to detain a defendant pending trial. *See United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) (finding

that pretrial detention was even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness).

Danger may be established by clear and convincing evidence even when a defendant has not personally participated in any violent acts, but where that defendant plays a leadership role in a criminal enterprise engaged in violent acts at the direction of the defendant. *See*, *e.g.*, *United States v. Ciccone*, 312 F.3d 535, 543 (2d Cir. 2002) (affirming detention order of a defendant who was the *de facto* leader of the Gambino Crime Family where evidence proffered suggested the defendant directed violent activities of the organization); *United States v. Orena*, 986 F.2d 628, 632-33 (2d Cir. 1993) (district court erred in setting bail for defendants who were indicted as playing leadership roles in the Colombo Family of La Cosa Nostra, where the predicate acts included conspiring to commit murder, murder, and illegal possession of weapons); *United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985) (although the defendant did not directly participate in any of the crimes alleged, he was the leader of the criminal enterprise that carried out criminal activities at his direction, and therefore district court erred in ordering his release).

Similarly, a defendant's "alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction" and favors denying bail. *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019).

A court is not limited to only considering the charges pending against a defendant when "assessing the degree of danger posed by a defendant's release." *United States v.*

*Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015); *see also United States v. Rodriguez*, 950

F.2d 85, 88 (2d Cir. 1991) (reversing release and ordering detention while rejecting

"requirement that the violent conduct . . . be connected to the activity charged in the

indictment"); *United States v. Barone*, 387 F. App'x 88, 90 (2d Cir. 2010) (affirming

detention order based, in part, on a number of past uncharged crimes); *United States v.*

*Bellomo*, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996) ("Nor is the dangerousness of a

defendant determined solely by looking at the acts charged in the indictment.  There is no

requirement of a nexus between the charged conduct and the basis of a court's conclusion

that a defendant is a serious danger to the community.  This Court therefore may look

beyond the charged conduct to assess the degree of danger that the defendant poses."

(citations omitted)).

The statutory factors that a court must consider in any detention decision are as

follows:

(1)    the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or involves . . . a controlled substance, firearm, explosive, or destructive device;

(2)    the weight of the evidence against the person;

(3)    the history and characteristics of the person, including—

(A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial,

- 11 -

> sentencing, appeal, or completion of sentence for an offense
> under Federal, State, or local law; and

(4)   the nature and seriousness of the danger to any person or the
community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Mercedes*, 254 F.3d at 436 ("To determine whether the

presumptions of dangerousness and flight are rebutted, the district court considers . . . [the

factors set forth at] § 3142(g)."). "A district court has broad discretion to determine how

much weight to assign the factors listed in § 3142(g) based on the circumstances of a

particular case." *United States v. Zhang*, 55 F.4th 141, 144 (2d Cir. 2022). As explained

by the Second Circuit in *Zhang*:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider,
> it says nothing about the relative weight a court should give them when
> deciding whether to release or detain a defendant. That silence is
> unsurprising, because the weight given to each factor will inevitably vary
> from case to case, and might even vary depending on whether the inquiry
> relates to a defendant's danger or to his risk of flight. What is more, certain
> factors might interact with one another in a particular case in a way that alters
> a court's analysis of a defendant's danger to the community or flight risk.

*Id*. at 149-50 (citation omitted).

In reviewing a detention order of a magistrate judge, a district judge should not

simply defer to the judgment of the magistrate judge, but rather must reach her own

independent conclusions. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). "When

making its *de novo* review, the district court may rely on the record of the proceedings

before the magistrate judge and may also accept additional evidence." *United States v.

Marra*, 165 F. Supp. 2d 478, 481 (W.D.N.Y. 2001). "The rules of evidence do not apply

in a detention hearing" and "the government may proceed by proffer." *United States v.*

*Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).  But "[w]hether presented by proffer or direct evidence, courts retain the responsibility for assessing the accuracy of the Government's proof." *United States v. Enix*, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016) (quoting *United States v. Goba*, 240 F. Supp. 2d 242, 247 (W.D.N.Y. 2003)); *see also United States v. Martir*, 782 F.2d 1141, 1145-46 (2d Cir. 1986) (Court "retains the responsibility for assessing the reliability and accuracy of the government's information, whether presented by proffer or by direct proof.").  However, "a detention hearing is not to serve as a mini-trial . . . or as a discovery tool for the defendant . . . [and therefore] a government proffer need not always spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *Martir*, 782 F.2d at 1145.

## III.  <u>ANALYSIS</u>

Considering the first § 3142(g) factor, Defendant is charged with a crime of violence. *See United States v. Watkins*, 940 F.3d 152 (2d Cir. 2019).  Unlawful possession of a firearm by a convicted felon is a serious crime, carrying a maximum statutory penalty of 15 years in prison.  The dangerousness of the crime in this case is only heightened by the stolen nature of the firearm and Defendant's incredible denial to law enforcement of any knowledge of weapons or firearms within the Clubhouse.  In other words, not only does the evidence suggest that Defendant was breaking the law, but Defendant showed no hesitancy to lie to law enforcement about it.

The weight of the evidence against Defendant is strong.  This assessment is based on the photographic evidence offered by the government, depicting the loaded firearm in close proximity to the sleeping area that Defendant was using and near the living area, right

across from the TV stand containing Defendant's cell phone.  This assessment is also based on Defendant's statements made to law enforcement when he was first encountered upon execution of the search warrant—denying that there were any weapons in the clubhouse even though the loaded Glock was in plain view near the living area next to Defendant's sleeping quarters (and even though other weapons were in the Clubhouse).

In connection with the third § 3142(g) factor, the Court recognizes that Defendant is somewhat disabled due to major revision spine surgery that occurred on November 14, 2023.  Moreover, the Court is cognizant of Defendant's medical situation and the necessity that he receive proper medical care, which may be complicated by any incarceration. However, balanced against those facts is Defendant's transient lifestyle, consistent with his apparent position within the Outlaws MC.  He has no family ties to the area, or even any identified family.   While Defendant's felony conviction is dated, his more recent misdemeanor convictions are not—and reflect dangerous activity where Defendant appears to have engaged in an act of violence in order to promote the Outlaws MC and prevent other individuals from wearing colors supporting a rival club in Outlaws MC territory. Defendant is similarly depicted on video engaging in a show of force with respect to an individual wearing colors supporting a rival motorcycle club at Halligan's Bar in November 2022—just over a year ago.

Although Defendant's counsel has proffered that Defendant has been employed as a member of the International Brotherhood of Electricians, the record concerning his employment is questionable.  At the time of his current arrest Defendant was not employed, and according to the arrest record from the New Hampshire incident, Defendant was

similarly not employed.  At best, Defendant's employment is inconsistent and certainly not reflective of a longstanding job that may diminish the Court's concerns about Defendant's risk of flight.

Although Defendant has not disclosed financial resources that could potentially fund an effort to flee, his proffered position within the Outlaws MC presents significant concerns.  The Court finds that the government has established by clear and convincing evidence that Defendant holds a prominent leadership role within the Outlaws MC, and his role is related to enforcement.[13]  As a result, Defendant has ready access to a vast network that could easily facilitate an effort to flee and hide from law enforcement.  If nothing else, his most recent living arrangements at the Outlaws MC Clubhouse demonstrate that.  In other words, with not an undue amount of effort, Defendant could be secreted away in any one of the clubhouses throughout the country.  And while Defendant denied to USPO any international travel or documentation to allow the same, the Outlaws MC has a vast international network that presents significant concerns about Defendant's risk of flight.

With respect to the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release, the Court concludes that it is significant.  The government has offered evidence that Defendant has engaged in acts of

---

[13]    The Court is not prepared to conclude at this stage that Defendant holds the role of "National Enforcer" but it is not necessary for the Court to resolve whether Defendant has been bestowed that particular title.  Plainly, Defendant has a national leadership role within the organization.  This conclusion is based on his close proximity to Ermin, who the Court concludes the government has established is the president of the Outlaws MC, and it is also based on Defendant's patches and clothing, his living at the Outlaws MC Clubhouse and transient lifestyle, and the communications recovered from the search warrant, including the letter from Rosga.

violence or threats of violence simply to protect against other individuals wearing colors supporting a rival motorcycle club within Outlaws MC so-called territory. Moreover, Defendant is a member of an organization that endorses without reservation the notion that individuals should not cooperate with law enforcement and those who do should be punished. The Outlaws MC has strong links to Pharaoh's and its owner, Peter Gerace, who is charged criminally and facing a significant sentence if convicted. One witness who was cooperating with the government has died under suspicious circumstances after expressing fear of "bikers" and the Outlaws MC. The Outlaws MC Clubhouse, where Defendant was residing, has a history of violent assaults, including against women, and the use of drugs.

In sum, based on the totality of the evidence proffered by the government and based on its consideration of all the relevant factors, the Court concludes that the government has established by clear and convincing evidence that Defendant's release would present a risk of danger and that no conditions can reasonably protect against that risk, and the Court further concludes that the government has established by a preponderance of the evidence that Defendant would present a risk of flight if released and that no conditions can reasonably protect against that risk. Accordingly, Defendant shall be detained pending the trial of this action, and the order of release is revoked.

## **CONCLUSION**

For the foregoing reasons, the government's appeal of the magistrate judge's release order is granted, and the Court hereby orders pursuant to 18 U.S.C. § 3142(e) that the defendant Scott J. Barnes be detained pending trial. Defendant shall be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the

extent practical, from persons awaiting or serving sentences or being held in custody pending appeal.   The Court further orders that Defendant be afforded reasonable opportunity for private consultation with counsel.  Finally, the Court directs that, on order of the Court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which Defendant is confined shall deliver the Defendant to a United States Marshal for the purposes of his appearance in connection with any court proceeding.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        January 3, 2024
              Rochester, New York